IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Jane Doe<br><br>    Plaintiff,<br><br> vs.<br><br>Ashland University<br><br>    Defendant. | Case No. 1:18-cv-00816<br><br>Judge Dan Aaron Polster<br><br>Magistrate Judge Jonathan D. Greenberg |

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

### NATURE OF ACTION

1. This is a civil-rights action brought under Title IX of the Education Amendments of 1972, as amended. Plaintiff Jane Doe alleges that Ashland University   through individuals such as Director of Student Conduct and Diversity and deputy Title IX coordinator Jonathan Locust, Director of Human Resources and Legal Affairs Joshua Hughes, President Carlos Campo, and others   failed to adequately respond to Ms. Doe's reports of sexual assault and subsequent retaliation, including by failing to report the first assault to the Title IX coordinator, failing to adequately investigate a second reported assault, failing to train its Title IX personnel in procedure, failing to investigate retaliation, failing to protect Ms. Doe from that retaliation, and retaliating against her for reporting the assaults and retaliation by her fellow students. The University ignored her repeated pleas for help, leaving her too petrified to even leave her room without an escort and too scared to even report a threat from her perpetrator, devastating her.

**PARTIES**

2.      Plaintiff Jane Doe is a 2017 graduate of the Ashland University.

3.      Defendant Ashland University is a private university located in Ashland County, Ohio. Each University official or employee identified below was acting within the course and scope of his or her duties at all relevant times.

**JURISDICTION AND VENUE**

4.      Jurisdiction over federal claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681  88 is asserted under 28 U.S.C. §§ 1331 and 1343.

5.      The Court has personal jurisdiction over Defendant and venue is proper here under 28 U.S.C. § 1391 because the relevant events took place within this Court's jurisdiction.

**FACTUAL BACKGROUND**

**Jane Doe is a successful and engaged Ashland University student.**

6.      Ms. Doe enrolled at Ashland University as a freshman in August 2013. She earned above-average grades, served as a member of several student organizations, and enjoyed peer friendships.

7.      In her second, third, and fourth years, Ms. Doe participated in the Orientation Team, which required extensive collaboration with the University administration.

8.      During her third year, Ms. Doe's peers elected her President of the Black Student Alliance and Diversity on Campus ("BSA"), to serve through her graduation.

9.      Around the same time, Director of Student Conduct and Diversity, Jonathan Locust, hired Ms. Doe as his Diversity Intern.

10.      Ms. Doe served as a student-conduct board panelist for several semesters.

**Ashland football player Daivon Barrow sexually assaults Ms. Doe.**

11.     On or around April 7, 2016, Daivon Barrow, a male student and starter on the University's undefeated football team, sexually assaulted Ms. Doe.

12.     Ms. Doe had first become acquainted with Mr. Barrow through her work with the BSA. Upon information and belief, Mr. Barrow was aware that before April 7, 2016, Ms. Doe had never consumed alcohol or engaged in sexual activity.

13.     Because Ms. Doe's 21ˢ birthday was approaching, she discussed with her friends that she would rather try alcohol for the first time in her dorm room, which she felt would be safer than accidentally drinking too much in a bar. To that end, she and her friends planned to drink in their residence hall that evening.

14.     Aware of the gathering, Mr. Barrow stopped by Ms. Doe's room for a short while.

15.     As the night progressed, Ms. Doe, who was unaware of her limits, became intoxicated.

16.     A couple hours after he had left Ms. Doe's room, Mr. Barrow sent her text messages asking her whether she had been drinking, and then a text message asking her to join him in his room. Mr. Barrow, upon information and belief, was not intoxicated.

17.     Accompanied by her friend Rachel, Ms. Doe went to Mr. Barrow's room. Rachel, however, warned Mr. Barrow that Ms. Doe was too intoxicated and needed to go downstairs. Rachel took Ms. Doe back to her own room, then left to find their other friends.

18.     Once Ms. Doe was back in her room, Mr. Barrow again texted Ms. Doe, inviting Ms. Doe to his room. Ms. Doe complied.

19.     When Ms. Doe arrived, Mr. Barrow told her he was going to change, but instead pulled down his pants. A large individual who tackled for the football team, he hovered over Ms. Doe and made Ms. Doe perform oral sex on him, despite her saying, "no," "I don't want to," and expressing other verbal protests.

20.     Ms. Doe was incapable of giving consent to sexual activity given her level of intoxication.

21.     Ms. Doe felt upset and confused, and embarrassed. She had no previous sexual experience of any kind before Mr. Barrow sexually assaulted her.

22.     Mr. Barrow's conduct violated the University's Title IX policy, which prohibits non-consensual sexual contact.

### Ms. Doe tells her mentor, deputy Title IX coordinator Jonathan Locust, of the assault, and he blows it off, telling her alcohol is a "truth serum." He never reports the assault to the University's Title IX coordinators.

23.     On or around Monday, April 11, 2016, Ms. Doe met with her supervisor, Director of Student Conduct and Diversity Jonathan Locust, whom she viewed as a mentor.

24.     At the time, Mr. Locust was one of several deputy Title IX coordinators at Ashland University.

25.     According to the University's written Title IX policy, as a deputy Title IX coordinator, Mr. Locust's duties included assisting in training employees on the school's Title IX policy, processes, and resources, as well as conducting investigations, and performing advisor duties.

26.     But Mr. Locust failed to perform his duties vis-à-vis Ms. Doe's sexual-assault report.

27.     During the meeting, Ms. Doe told Mr. Locust about the assault.

28.     Mr. Locust responded by telling Ms. Doe that alcohol is a "truth serum," and that if she was drinking at the time, she must have wanted to engage in oral sex with Mr. Barrow. Mr. Locust went on to ask Ms. Doe if she enjoyed the sexual activity.

29.     Mr. Locust did not provide Ms. Doe with a copy of the University policy on sexual violence or with any information about how to access services or resources for victims of sexual abuse.

30.     Ms. Doe left the meeting feeling that her mentor, Mr. Locust, had dismissed and minimized the assault, and had blamed her for her own victimization.

31.     The University's Sexual Misconduct and Prevention/Title IX Policy states that "Ashland is obligated to follow up on all allegations." With limited, enumerated exceptions, the policy requires employees to "report a violation of this policy to a Title IX Coordinator once they become aware."

32.     Mr. Locust did not report the sexual assault to the school's Title IX coordinators, add the information to the campus Clery Act report, or begin an investigation himself.

33.     He thus did not comply with his duty under written University policy.

34.     Later, on another occasion before the end of the spring 2016 semester, Ms. Doe had been drinking and stopped by Mr. Barrow's room. They had previously been close friends, at one point even texting every day. Mr. Barrow, noticing that she was intoxicated, asked her to perform oral sex. When she declined, he attempted to give her more alcohol. Ms. Doe refused the drink and left the room.

35.     Ms. Doe brought this incident up in a meeting with Mr. Locust, who responded by asking, "What did you expect?" Mr. Locust also responded by stating words to the effect that "when I was his age, I was just like Daivon, but probably worse."

36.     This conversation, like the conversation in which Mr. Locust responded to the sexual assault by saying alcohol was a "truth serum," left Ms. Doe feeling that what happened to her must have been normal, to the point that she began to believe she needed to accept it and move on.

37.     On other occasions before the end of the semester in 2016, Ms. Doe reported to Mr. Locust the fact that Mr. Barrow would ask her for oral sex    including one time when Mr. Barrow locked the door of the room    and she would refuse but Mr. Barrow would then take her

---

The Clery Act requires the University to maintain and disclose campus crime statistics and security information.

hand and put it on his penis. Ms. Doe also showed Mr. Locust Mr. Barrow's text messages asking for "head," to which she did not respond. Mr. Locust did not address the unwanted sexual touching as sexual misconduct; he just shook his head and laughed.

38.    When Ms. Doe and Mr. Barrow returned from the summer break, Ms. Doe had a conversation with Mr. Barrow (when both were sober) in which she made it abundantly clear to him that she did not wish to have a sexual relationship with him. Given that the two were in the same friends' circle and both members of the BSA, she felt it was necessary to clearly set her expectations as he was not a person she could easily avoid.

**Mr. Barrow sexually assaults Ms. Doe again.**

39.    In the wee hours of September 11, 2016, Mr. Barrow sexually assaulted Ms. Doe again.

40.    Ms. Doe had been drinking heavily and had gone to a bar with her roommate Rose and other friends. As they were leaving to return to their residence hall, she and Rose ran into Mr. Barrow and the three walked together. Upon information and belief, Mr. Barrow had not been drinking. At a certain point, Ms. Doe and Mr. Barrow ended up walking back alone. (Rose turned back to retrieve her phone from the bar, accompanied by another football player.) As they walked, Mr. Barrow told Ms. Doe he wanted to come to her room. She told him she didn't think it was a good idea, but he said they could just drink a little bit and then he would leave. She acceded.

41.    Ms. Doe was incapable of giving consent to sexual activity given her level of intoxication.

42.    Once in her sitting room, Mr. Barrow was on the couch, and Ms. Doe sat on the floor to maintain some distance between them. At a certain point, to Ms. Doe's dismay, Mr. Barrow began asking her for oral sex, which Ms. Doe repeatedly refused. She moved further away from him to sit against the wall, putting more distance between them. He plugged his phone into Ms. Doe's speakers and began to blast his music.

43.     He then pulled down his pants and came toward her. She felt terrified. All she could think of was how big and intimidating he looked, and frantically wondered why Rose was not back yet.

44.     With Mr. Barrow hovering over her, Ms. Doe told him that she did not want to give him oral sex, but with his free hand   the other touching himself   he gripped her under the chin and forced her to. Before he ejaculated, Ms. Doe managed to turn her face. The semen spread all over her cheek.

45.     He let go. She felt repulsed, disgusted, and ashamed. She was angry and told him that he did this every time, i.e., when she drank, he demanded oral sex. She eventually got up and left the apartment to use the common bathroom down the hall and wash the ejaculate off her face. (There was a private bathroom off the sitting room but she did not want to stay in the same space as Mr. Barrow.) As she left the common bathroom, she saw Mr. Barrow exit the building.

46.     The next day, Ms. Doe told Rose about what occurred. Upset and crying, she also told one of the resident advisers (RAs) in her hall, who was also a friend at the time   Kailah Sanders. Ms. Sanders suggested that Ms. Doe speak to Mr. Locust. Ms. Sanders mentioned nothing about her own duty, as an RA, to report sexual assault under the University's Title IX Policy. She did not report it.

### Ms. Doe informs deputy Title IX coordinator Locust, who formally reports against her wishes, and gives her misinformation about the Title IX process.

47.     Still hesitant from her previous experience of Mr. Locust dismissing the April assault and other non-consensual sexual contact by Mr. Barrow, Ms. Doe nonetheless reached out to Mr. Locust on Ms. Sanders's suggestion. When it turned out he was not available to speak in person, she changed her mind. She decided she did not want to tell Mr. Locust after all. She did not want to tell anyone.

48.     Under the University's Title IX policy, a student is not to be pressured in her decision-making. Nor does the policy require a student to report.

49.     But the next day, on or around September 14, 2016, while she was working her regular hours in the student-conduct office, Mr. Locust pressed her to tell him anyway.

50.     He, in turn, reported to one of the University's Title IX coordinators, Hannah Clayborne. Ms. Doe felt extremely uncomfortable with the report to Dr. Clayborne, who supervised Mr. Barrow on the Student Senate. The events that occurred next would show the University's failure to train, failure to implement its policy, failure to timely or appropriately investigate, and failure to address retaliation.

51.     Under the University's Title IX policy, the Title IX coordinators are responsible for "helping to ensure that the university responds appropriately, effectively, and equitably to Title IX issues." The Title IX coordinators failed to do so in Ms. Doe's case.

52.     The University failed to provide timely information. Ms. Doe repeatedly sought information about the Title IX process. But she had four meetings with either Mr. Locust or Dr. Clayborne before she even received the packet of information on Title IX and resources.

53.     During her first meeting with Dr. Clayborne, Dr. Clayborne also minimized Ms. Doe's assault. Despite knowing of the allegations, she told Ms. Doe that the University would have to determine whether this was a Title IX situation or not.

54.     Mr. Locust, despite being a deputy Title IX coordinator, was ignorant of basic aspects of the school's Title IX policy and provided Ms. Doe misinformation on the Title IX process, causing her much confusion and distress. On or around September 20, 2016, he assured her that once she had told him about the rape, what happened next was up to her, that nothing would happen unless Ms. Doe initiated it. While he correctly told her that if she did not want to make a formal complaint, she did not have to, he failed to explain that under University policy,

regardless whether she participated, an investigation against Mr. Barrow (under Mr. Locust's report to Dr. Clayborne) would proceed, and that Mr. Barrow would be informed of the charge.

55.     Based on what he told her, Ms. Doe felt reassured that she would be in control of what, if anything, happened next in the process. She felt jolted, then, when later that day, she went to her second meeting with Dr. Clayborne and Dr. Clayborne told her that, as part of the Title IX process, Mr. Barrow would have to be informed of Ms. Doe's report. Ms. Doe was not even aware at that point that Dr. Clayborne knew the perpetrator was Mr. Barrow. She had not wished even to tell Mr. Locust about the assault and now Dr. Clayborne was telling her that Mr. Barrow would have to be informed. Ms. Doe was very upset by this turn of events.

56.     Ultimately, Mr. Locust and Dr. Clayborne decided that Mr. Locust would speak to Mr. Barrow about the allegation. Upon information and belief, Mr. Locust spoke to Mr. Barrow soon thereafter.

**Ms. Doe begins to experience retaliation for having reported.**

57.     Soon after reporting the assault, Ms. Doe began to experience retaliation from Mr. Barrow's friends, in particular Keirra Walker and Monae Goode-Harris. Toward the end of September 2016, sometime between September 21 and 29, Ms. Walker informed Ms. Doe's RA that (contrary to policy) Ms. Doe and her roommate had kittens in their room (which they soon thereafter gave away). Ms. Doe was baffled as to why Ms. Walker would do this, as they had gotten along previously.

58.     On September 29, 2016, Ms. Goode-Harris texted Ms. Doe threatening her for "snitch[ing] on other people." The text read in part: "Aye imma say this once and one time only … You a whole ass 21 & cant tell nobody when you fskw [feel some kinda way] over something but tell everybody else . . . If you wanna grow up and speak up you know exactly where to find me."

59.     The text startled Ms. Doe, as well as her roommate Rose. Both began to feel unsafe in their apartment, as Ms. Walker and others in the same friends' circle lived in their residence hall, and Ms. Goode-Harris was a frequent visitor.

60.     Ms. Doe reported the text message to Safety Services. Safety Services director Dave McLaughlin (who later became one of Ms. Doe's Title IX investigators) then restricted Ms. Goode-Harris from Ms. Doe's residence. But Ms. Goode-Harris violated that order by visiting Kailah Sanders    the same RA to whom Ms. Doe had confided the assault and who should have been trained better than to allow a prohibited person from entering.

61.     Around the same time, on or around September 29 or 30, 2016, Ms. Doe learned from her friend Margaret    also part of the clique    that Mr. Barrow had indeed told the entire group about the accusation against him, and that he figured Ms. Doe must have been the one to make it. He denied any wrongdoing, and smeared Ms. Doe's name, stating that on the evening in question, nothing had happened, that Ms. Doe had tried to "throw her virginity" at him, and that he had not even entered the room.

62.     On September 30, 2016, Ms. Doe texted Mr. Locust about the retaliatory actions, saying that Ms. Goode-Harris and Ms. Walker wanted to fight her, and indicating that Mr. Barrow was behind the hostility: "… Monae and Kierra want to fight me over nothing . . . & Daivon is getting out of hand with the situation." Mr. Locust responded that nobody was going to fight her.

**Frustrated with Mr. Locust's and Dr. Clayborne's handling of the Title IX process, Ms. Doe meets with the University president, and Dr. Clayborne intimidates Ms. Doe for having done so.**

63.     The University's Title IX Policy states that the "University cannot require the reporting party to discuss the matter further with others, for example, the Title IX Coordinator." And students are not to be "pressured in any of their decision making." Yet the University continued to ignore these mandates.

64.      In early October 2016, Dr. Clayborne requested another meeting with Ms. Doe. Ms. Doe, still uncertain of the steps of the Title IX process, asked Mr. Locust what the meeting would be about, to which Mr. Locust responded that "Dr. Clayborne is my boss, I am your boss, and it would be in [your] best interest to meet with her."

65.      But neither Mr. Locust nor Dr. Clayborne had given Ms. Doe a reason to trust them Mr. Locust because he failed to follow procedure and seemed not to know what he was doing, and Dr. Clayborne because she appeared to have a conflict, given her existing relationship with Mr. Barrow, and because she had minimized the assault and failed to take Ms. Doe's privacy and expressed wishes into account. So Ms. Doe did not agree to meet with Dr. Clayborne. She was well within her right under the University's Title IX policy to make such a choice.

66.      Encouraged by a counselor, Ms. Doe instead decided to write about her Title IX experience for the campus newspaper and met with one of the editors.

67.      Ms. Doe also took her concerns to the University's president, Dr. Carlos Campo, to whom Ms. Doe expressed her frustration in the lack of clarity regarding the Title IX process and the school's inability to provide her with coordinators not closely acquainted with her perpetrator. (Dr. Campo also seemed to know her perpetrator's identity, which was disconcerting to Ms. Doe because Mr. Barrow was an intern in Dr. Campo's office.) Ms. Doe suspected that the University officials were working to protect Mr. Barrow to her detriment.

68.      Shortly after this meeting, contravening Title IX policy's mandates, Title IX coordinator Dr. Clayborne demanded to meet with Ms. Doe to determine what she had told the campus newspaper and Dr. Campo. First, on or around October 26, 2016, while Ms. Doe was working her regular shift in the Student Conduct office, Dr. Clayborne's assistant Stephanie Bull entered the student-worker space and closed the door behind her, threatening Ms. Doe that she would

send Safety Services to escort Ms. Doe if she refused to meet with Dr. Clayborne. Ms. Doe refused.

69.     Then, toward the end of her shift, as Ms. Doe was preparing to leave to meet with a professor, Dr. Clayborne herself came into the office, closed the door behind her and stood in front of it, demanding to know what Ms. Doe had discussed with Dr. Campo and whether it was true that Ms. Doe was writing an article about the rape.

70.     Ms. Doe felt intimidated and trapped. She affirmed that she was writing an article and stated that she did not wish to speak to Dr. Clayborne, including because of how closely Dr. Clayborne worked with Mr. Barrow because of the frequent Student Senate meetings in which they were both involved. Finally, Ms. Doe insisted she had to meet with her professor, and Dr. Clayborne moved out of the way to let Ms. Doe leave.

71.     Again, Ms. Doe was shaken by this treatment from those who were supposed to be protecting her. She was in tears during the meeting with her professor.

**Ms. Doe decides to file a formal Title IX complaint.**

72.     Later that day, Ms. Doe attended the Student Speak-Up, a bi-annual campus event designed for students to air concerns with a panel of administrative leadership, including Dr. Campo.

73.     Ms. Doe prepared a list of questions about the Title IX process but found herself unable to speak when Mr. Barrow walked into the event. As a result, Ms. Doe gave her list to her friend Alex, who asked, "Why should students report rape on campus, when after you do, your Title IX coordinator locks you in a room and won't let you leave?"

74.     Dr. Campo turned to look directly and pointedly at Ms. Doe and stated that students need to report rape because it "is the morally right thing to do."

75.     Following this public exposure of her trauma, word spread that someone was planning an article, and some tied the piece to Ms. Doe. Distraught because she had intended to remain anonymous as the author, Ms. Doe decided not to go forward with the piece.

76.     On or around October 27, 2016, Ms. Doe met with Mr. Locust, telling him what occurred at the Speak Up. Mr. Locust asked Ms. Doe why she had not formally reported the assault yet, to which Ms. Doe responded that she had not wanted to damage Mr. Barrow's reputation. Mr. Locust said, "You've already damaged it," and stated that Mr. Barrow was upset about her initial report. Mr. Locust then said that Ms. Doe was "losing credibility" by not officially reporting the rape.

77.     Mr. Locust's approach again contravened University policy: first, the "reporting" had already happened; the policy makes no distinction between "formal" reporting and unofficial reporting; second, he was pressuring her when she had no obligation to discuss the matters with the Title IX coordinator; third, his references to Mr. Barrow's feelings defied the policy's expectation not to blame the victim.

78.     For the first time, Mr. Locust also informed Ms. Doe that there was another Title IX coordinator, attorney Joshua Hughes (also the Director of Human Resources and Legal Affairs), to whom she could report if she did not want to speak to Dr. Clayborne.

79.     Ms. Doe decided to make a formal complaint to Mr. Hughes and emailed him as soon as she left Mr. Locust's office.

**Ms. Doe makes a Title IX complaint regarding her assaults, and experiences fresh retaliation.**

80.     On the same day, October 27, 2016, Ms. Doe met with Mr. Hughes, and told him everything that had happened and expressed that she wished to proceed with the report. As she had repeatedly to others, she asked Mr. Hughes about the Title IX process. Although he pointed

her to the website, he did not provide much additional information, other than telling her there would be investigators, and a final decision would be made by the Vice President of Student Affairs (which sounded like Dr. Clayborne). But it remained unclear to Ms. Doe what the process would be, and why Student Affairs would have the final decision if Mr. Hughes was the Title IX coordinator.

81.    Mr. Hughes said she could go forward making a formal complaint using the initial email that Mr. Locust had transmitted to Dr. Clayborne regarding the September assault, so Ms. Doe did so.

82.    At the same time, Mr. Hughes issued a no-contact directive barring Mr. Barrow from her work space while Ms. Doe was present.

83.    Mr. Hughes notified Mr. Locust of this no-contact directive, and informed Ms. Doe that Mr. Locust would notify Mr. Barrow.

84.    In the meantime, after Ms. Doe made her official Title IX report and Mr. Hughes issued a no-contact directive, Mr. Barrow's friends again retaliated against Ms. Doe and her friends with defamatory, threatening remarks. On or around October 27, 2018, Ms. Walker photographed Ms. Doe without her knowledge in the residence-hall lobby, and posted it on Snapchat, with the caption, "Hi my name is [Jane], and I like lying on people."

85.    Ms. Doe immediately took this Snapchat image to Safety Services, who said they would report it to Mr. Locust. During the next work shift, Mr. Locust told Ms. Doe that he would speak to Ms. Walker about the message. But Ms. Walker was not disciplined.

86.    On or around October 28, 2016, Ms. Doe's friend Brittany, the one who forwarded to Ms. Doe the retaliatory Snapchat image, also received a threatening text, asking her if she was the one who had sent the Snapchat image to Ms. Doe and promising to "smack[] the f*** out of" Brittany if Ms. Walker saw her:



87.     On or around November 3, 2016, Ms. Doe informed Mr. Hughes of the retaliation, including sharing the above text.

88.     The University's Title IX policy states that the University "will not tolerate retaliation in any form against any faculty, staff, student, or volunteer who files an allegation, serves as a witness, assists an alleger, or participates in an investigation of discrimination or harassment."

89.     Despite Ms. Doe's complaint, however, upon information and belief, the University failed to formally investigate the retaliation that Ms. Doe reported, including the threats against Ms. Doe's friend Brittany.

90.     Mr. Hughes's investigation of retaliation against Ms. Doe consisted of speaking to Mr. Locust, who, upon information and belief, relayed his belief that Ms. Doe's peers were not driven by the Title IX complaint. But Mr. Locust was not the most reliable source   as he too had a reason to retaliate given her complaints about his mishandling of the matter from the outset, described next.

91.     On or around November 3, 2016, the same time as she reported peer retaliation to Mr. Hughes, Ms. Doe also reported to Mr. Hughes Mr. Locust's failures to handle her Title IX issues properly. Regarding the first assault, she complained about his failure to report the assault to Ashland administrators responsible for Title IX and Clery Act compliance; his failure to provide her information about further reporting she might have undertaken; and his inappropriate, victim-blaming comments about alcohol being "truth serum," implying that she must have wanted the sexual assault if she was drinking. Regarding the September assault, she complained of his failure to provide her correct information or follow correct procedure, as well as about comments he made expressing sympathy for the perpetrator.

92.     Mr. Hughes took no notes when Ms. Doe complained about Mr. Locust and did not seem to take her complaint seriously. And when Ms. Doe inquired about the timeline for a Title IX process, Mr. Hughes himself responded that "I know you want this to be over, but so does Mr. Barrow." This was another blow. It seemed to Ms. Doe that this University Title IX coordinator was more concerned about this football player's feelings than the physical and emotional trauma she had endured at his hands.

93.    Ms. Doe also asked Mr. Hughes again about the Title IX process and Mr. Hughes responded that the investigators would investigate, and then he, Mr. Hughes, would make a determination that would then go to Student Affairs for a decision on the sanctions. (This was different from what the Title IX investigators told Ms. Doe later.) Ms. Doe understood "Student Affairs" to mean Dr. Clayborne, which was dismaying to Ms. Doe given Dr. Clayborne's behavior and connection to Mr. Barrow.

94.    Upon information and belief, Mr. Hughes did not follow up on the complaint involving Mr. Locust. Mr. Hughes did not include it as part of the Title IX investigation. Nor did he ever speak about the Locust complaint to Ms. Doe again.

95.    Upon information and belief, the University conducted no investigation of Mr. Locust's violations of written University policy.

96.    Upon information and belief, the University took no steps to discipline Mr. Locust for failing to follow written University policy regarding forwarding the violation to the Title IX coordinator.

97.    The University failed to effectively implement and/or enforce its written policies, e.g., by effectively training Mr. Locust about his duties or by disciplining Mr. Locust when he failed to comply with the written directives for responding in the face of a sexual-misconduct allegation.

98.    Had the University effectively trained Mr. Locust, had Mr. Locust not dismissed or minimized the April assault, and had he reported the April assault as required by written University policy, Ms. Doe may have been spared the second sexual assault by the same perpetrator, as well as the retaliation she subsequently faced for filing a complaint regarding that second assault.

### Ms. Doe meets with the Director of Residence Life to address retaliation, and the Title IX investigators to address the assault.

99.     On or around November 7, 2016, having received no assurance that anything was being done to address the retaliation she had reported and fearing it would only get worse now that she had officially started the Title IX process, Ms. Doe reached out to the Director of Residence Life, Kim Lammers. Ms. Doe expressed concern about RA Kailah Sanders's failing to report the assault when Ms. Doe reported it to her and ignoring Ms. Goode-Harris's restriction not to enter Kilhefner Hall. The following day, Ms. Doe met with Ms. Lammers to discuss these issues.

100.    Ms. Lammers asked Ms. Doe whether anyone had mentioned a no-contact order to her, and no one had. Ms. Lammers suggested this as a route by which her department might have some authority to take action, although she said that to get one in place, she would still have to talk to Mr. Locust.

101.    On November 10, Mr. Locust emailed Ms. Doe to confirm the five students for whom no-contact orders should be issued: Ms. Goode-Harris, Ms. Walker, Ms. Sanders, and two others who were in the same friends circle    Shamarr Golden, and Taylor Banks. (All were within the same tight group of friends who had begun to act antagonistically or text among each other their hostility toward Ms. Doe.)

102.    On the same day, Ms. Doe    along with Liz Painter, her advocate and outreach coordinator from the Rape Crisis Domestic Violence Safe Haven    had her first meeting with the Title IX investigators, Dave McLaughlin and Rachel O'Connor. As with Dr. Clayborne and Dr. Campo, Ms. Doe was concerned about these individuals' participation. Ms. O'Connor worked with Mr. Barrow's major (sports communications), as well as with the football team. Mr. McLaughlin, too, had previously worked with both Ms. Doe and Mr. Barrow on presentations about Title IX  and safety on campus.

103.    Mr. McLaughlin dominated the questioning during the meeting. To Ms. Doe's chagrin, his questioning was skeptical and accusatory, asking questions such as, "if you are concerned that that might lead to something, why would you want to go over to his room?"

104.    Ms. Doe described the sexual assaults and the ensuing retaliatory peer harassment. She provided names such as her friends Margaret, Rose, Rachel, Max, and Kiara, who knew about various aspects of the narrative. Ms. Doe mentioned Kiara, for example, as another student whom Mr. Barrow would ask for oral sex. Ms. Doe also provided Ms. Walker's and Ms. Goode-Harris's names regarding the retaliation. Mr. McLaughlin said he would talk to them, although he also minimized the actions taken against her, saying that she was alleging these former friends were harassing her "a little bit." Ms. Doe left the meeting feeling demeaned.

105.    Upon information and belief, the investigators did not interview Margaret, Rachel, Kiara, and many others Ms. Doe mentioned before a determination on the Title IX case was made.

106.    After this meeting, Liz Painter, the outreach coordinator, feeling that the process was not proceeding in compliance with Title IX, sought further assistance from a legal advocate at the Ohio Alliance to End Sexual Violence ("Ohio Alliance").

107.    After the meeting, Mr. McLaughlin also added the April assault to the campus Clery report.

### With the University doing little to help stop the retaliation, Ms. Doe faces escalating peer retaliation and reports to the police.

108.    On November 11, the day after the no-contact orders went out   also, Ms. Doe learned, the day after Mr. Barrow lost his internship in the president's office   the retaliation against Ms. Doe escalated. That day, several of the students against whom there were no-contact orders, and

who were also board members of the student group BSA, retaliated further against Ms. Doe by voting to remove her from her position as president of the organization.

109.     Ms. Doe contacted Mr. Locust about the retaliatory action. To her surprise, he told her he felt comfortable with their decision, citing purported reasons the board members had given such as that she had not attended the BSA barbeque or helped with event clean-up earlier in the semester. These were pretextual, as the students had known ahead of time that Ms. Doe could not make it to most of the event because of orientation commitments, and the barbeque took place months earlier, in August 2016 (thus if that were the true reason for their actions, they would have acted much earlier).

110.     Mr. Locust told Ms. Doe that the BSA members who removed her had told him of their plans in October; he also stated that Ms. Doe herself had mentioned wanting to leave the BSA board. But neither of these excused the students' action: by October, the students had already learned that Ms. Doe had reported the assault to Mr. Locust, and had already begun retaliating; and she had mentioned wanting to leave because of the stress of the retaliation that had already begun.

111.     By approving of her peer retaliators' actions against Ms. Doe, Mr. Locust actively participated in and sanctioned the retaliation.

112.     Unsupported by the University, and feeling increasingly concerned for her safety, on November 12, Ms. Doe contacted Mr. McLaughlin, one of the Title IX investigators. Mr. McLaughlin provided contact information for the police department. (He also, curiously, stated that if Ms. Doe "fill[s] out a statement regarding the retaliation contact [she] experienced," they would "respond to that as well." But it is unclear what additional statement the investigators needed to investigate what Ms. Doe had already reported. And no one followed up to clarify with her.)

113.    And the retaliation did not cease. On or around November 16, 2016, Ms. Walker intentionally shoulder-checked Ms. Doe in their residence hallway (which is large enough to accommodate individuals passing by each other without physically touching). Ms. Doe reported this to Safety Services, and it became the subject of a student-conduct board hearing.

114.    As part of the retaliation, *Ms. Doe* was also charged with a student-code violation for Ms. Walker's shoulder-check.

115.    Upon information and belief, Mr. Locust, as student-conduct director, had authority over whether and which conduct violations to pursue against a student. Thus, upon information and belief, Mr. Locust authorized Ms. Doe to be charged for a retaliatory act taken *against* her. This authorization itself was retaliatory and seemed designed to protect Mr. Barrow and his supporters by deterring Ms. Doe from pursuing appropriate remedies for the sexual assaults and retaliation.

116.    At the student-conduct board hearing, Ms. Doe explained that Ms. Walker's physical aggression was not a random incident but rather part of the retaliation that Ms. Walker had already begun to engage in by threatening Ms. Doe after Ms. Doe filed a Title IX complaint. But the student-conduct board on November 28, 2016 found no violation by either Ms. Doe or Ms. Walker. No one was present from the Title IX office. And the incident never became part of the Title IX investigation.

117.    Concerned about the escalating retaliation, on or around November 28, 2016, Ms. Doe reached out to Ms. Lammers and Mr. McLaughlin, seeking additional protection to extend the no-contact orders by banning the five students from her floor. After the student-conduct board hearing, the students had begun to loiter on her floor. Neither she nor her roommate Rose felt safe.

118.    Rather than have the peer retaliators cease their behavior or be required to move, Ms. Lammers and Mr. McLaughlin suggested that Ms. Doe and her roommate move. The building Mr. McLaughlin suggested was off-campus and inconvenient. Neither addressed the additional retaliation that was occurring. Moreover, despite the fact that Ms. Lammers had suggested putting the no-contact order in place to give her department something to enforce, her department did not remedy the violation.

119.    Also on November 28, 2016, frustrated with the University's failure to protect her, Ms. Doe made a police report, reporting the September sexual assault, the students' retaliatory harassment, and the University's failure to address the problem.

120.    On November 29, 2016, Ms. Doe and Ms. Painter attended a second meeting with Title IX investigators Mr. McLaughlin and Ms. O'Connor. Mr. McLaughlin's victim-blaming had sharpened. Despite the detail she had already provided of the rape and the fact that she had *told Mr. Barrow she did not want to engage in sexual activity*, he asked her "When he put his hand underneath your chin, did you try to resist at all?," "You never told him you didn't want to do that?"

121.    Toward the end of the meeting, Ms. Doe asked again, following up on an earlier communication, whether the investigators had followed up on the peer retaliation. Mr. McLaughlin stated that he had talked to "six different girls," and that the student-conduct board had met "the other day for the retaliatory incident," suggesting that the student-conduct action sufficed for Title IX purposes. But upon information and belief, the student-conduct board, which consists of two students and two faculty, had no one on it in a Title IX capacity. Then, confirming Ms. Doe's concerns that the Title IX investigators were not adequately following up on her retaliation complaint, Mr. McLaughlin stated: **"Yeah, we gave all that to Jonathan [Locust] and he took care of that."** That is, the investigators gave the issue right back to

one of the sources of the problem  and one who had already expressed his approval of the peer retaliators' behavior and who was actively participating in the retaliation himself.

122.    In early December 2016, Ms. Doe also reached out to Nicole Dyer, the assistant dean of student affairs, to discuss the retaliatory stripping of her BSA leadership position. Ms. Dyer, however, also referred back to Mr. Locust: Mr. Locust had informed her that the same process to remove Ms. Doe from her position had been used in the past to remove other members. But this claim was untrue. The BSA had never removed an executive board member.

123.    In the meantime, on November 30, 2016, Ms. Doe and Rose submitted an application to move to a different residence hall, despite the fact that the only apartment presented as an option was much farther from campus and inconvenient. Ms. Doe did not want to move off campus, but felt she had to given that  as she explained to Ms. Lammers  "[a]fter the student conduct board[,] the girls came on my floor every night that week." And the University was taking no action against those peer retaliators to make her feel safe in her residence.

124.    Later that same day, Ms. Doe and her parents also met with Dr. Campo to discuss the University's failure to keep Ms. Doe safe. Dr. Campo failed to reassure them that things would change, however. Ms. Doe's parents, like Ms. Doe, left the meeting frustrated by the University's lack of action.

### While the school does nothing to protect Ms. Doe from retaliation, Mr. Barrow repeatedly violates his no-contact directive and Ms. Doe's peer retaliators are emboldened to commit battery, leading to student-conduct charges against *Ms. Doe*.

125.    On December 8, 2016, Mr. Barrow entered Ms. Doe's office in direct violation of his no-contact directive. Mr. Barrow stayed for approximately seven minutes, glaring at Ms. Doe, and then left with Taylor Banks, one of the female students against whom there was also a no-contact

order (although hers did not prohibit her from being in the Student Conduct office). As they left, Ms. Doe overheard Ms. Banks say to Ms. Barrow: "I saw the way you were staring at her."

126.    Ms. Doe reported this incident to Mr. Hughes, who informed Ms. Doe that he would meet with Mr. Locust and Mr. McLaughlin.

127.    The next day, December 9, 2016, Hughes sent an updated no-contact directive that, in addition to banning Mr. Barrow from Ms. Doe's workplace, also prohibited Mr. Barrow from entering Ms. Doe's residence hall, Kilhefner Hall.

128.    Yet although this no-contact order was put in place, the University failed to take immediate action against Mr. Barrow for the violation. It held a hearing over a month later.

129.    Meanwhile, emboldened by the University's failure to hold them accountable, Ms. Doe's retaliators continued their campaign of harassment, and the retaliation continued to escalate. On December 11, 2016, Ms. Doe joined her friends at Riley's, a bar near campus. When she arrived, Ms. Doe did not notice that four of the five female students retaliating against her were also present. But as Ms. Doe walked through the crowded bar to leave, she was shoulder-checked twice from behind. Scrambling to protect herself, Ms. Doe reacted to the blow by shoving the second person off of her as she turned around. Realizing it was Ms. Goode-Harris, Ms. Doe left immediately. She also saw Ms. Walker immediately in front of Ms. Goode-Harris, and thus believed the first shoulder-check came from Ms. Walker.

130.    The female students chased Ms. Doe out, shouting obscenities and threatening physical harm (Ms. Walker: "Get that b*, Monae!"), while Ms. Doe's friend Rachel attempted to block the students.

131.    Ms. Doe kept walking and was spared further attack when Ms. Goode-Harris swung to hit her only because Ms. Goode-Harris tripped over her boots in a snow bank. Ms. Goode-Harris's hand grazed Ms. Doe as Ms. Goode-Harris fell.

132.    Ms. Doe's friend Rachel stayed behind to report the physical assault to the bouncer, while Ms. Doe and Rose quickly walked to another establishment for safety, accompanied by two onlookers who were alarmed by what they had witnessed. Afraid they were vulnerable even there, Ms. Doe and Rose left the second establishment and walked on back roads to return to campus. Hearing from another friend that Ms. Goode-Harris and Ms. Walker were back at Kilhefner waiting for their return, Rose and Ms. Doe decided to stay with Rachel that evening instead of going back to their own apartment.

133.    Upon returning to campus, Ms. Doe and her friends immediately reported the incident (both Ms. Walker and Ms. Goode-Harris) to Safety Services. Even the Safety Services officer knew Ms. Walker and Ms. Goode-Harris, and warned Ms. Doe to "stay away from them!"

134.    Ms. Doe also informed Ms. Lammers of the incident on December 11, when discussing why she felt unsafe and compelled to move.

**Mr. Locust participates in the retaliation, helping Ms. Doe's retaliators report against her and jeopardizing her internship by challenging her previously negotiated hours. Ms. Doe reports to Mr. Hughes, to little effect.**

135.    While Ms. Doe reported the Riley's incident immediately, Ms. Goode-Harris waited for two days to report    in fact, the next day she bragged to her friends about supposedly beating up Ms. Doe. Upon information and belief, she reported Ms. Doe only upon Mr. Locust's encouragement. Ms. Goode-Harris gave her so-called report to Mr. McLaughlin in Mr. Locust's office.

136.    On December 14, Ms. Doe received an email notifying her that, as a result of Ms. Goode-Harris's report, *Ms. Doe* was now charged with two student-code violations: Student Conduct/Safety/Physical Abuse/Self Endangerment and Student Conduct/Integrity/Failure to Comply with Requests.

137.    Meanwhile, Mr. Barrow continued to violate the no-contact directive by entering Kilhefner Hall on December 12, 2016. While Ms. Doe was not present at the time, Margaret observed Mr. Barrow in the hall and alerted Ms. Doe. As with the December 8 violation, the University did not address this violation for over a month.

138.    Also, around December 12, 2016, Mr. Locust sought to change Ms. Doe's previously negotiated work schedule. When, in response to his request, she submitted her proposed ten hours per week to accommodate her student-teaching schedule, Mr. Locust stated that ten hours per week was insufficient to retain her internship.

139.    During her interview for the job and again when accepting the position, Ms. Doe had informed Mr. Locust about the student-teaching position she would need to complete during her final semester that would prevent her from being able to work the full 15 hours per week from January to May 2017. And Mr. Locust had had no problem with the schedule at that time. In fact, he had suggested she work over 15 hours per week whenever possible during the fall 2016 semester and on days she did not have to student teach to preemptively make up time    and she did so.

140.    When Ms. Doe reminded Mr. Locust of this arrangement, Mr. Locust threatened to terminate her if she could not find 15 hours per week to work.

141.    Concerned about the internship-hours threat and other retaliatory acts, as well as the direction of her Title IX investigation generally, on December 16, 2016, Ms. Doe had a phone conference with Mr. Hughes, accompanied by her support person Camille Crary, attorney with the Ohio Alliance.

142.    In addition to reporting Mr. Locust's retaliatory attempt to change her previously negotiated working hours, Ms. Doe also raised with Mr. Hughes concerns that the University was insisting the various peer-harassment actions were not Title IX-related, and that, contrary to

Title IX guidance, the burden was on being placed on her to move rather than any burden being placed on her retaliators.

143. While Mr. Hughes agreed to talk to Mr. Locust about her internship (ultimately, Mr. Locust agreed not to alter the original plan to accommodate Ms. Doe's schedule, though stated it was "not ideal"), Mr. Hughes dismissed Ms. Doe's retaliation complaints as he had in an earlier communication in which he had stated he did not believe either the issue of Ms. Doe moving apartments or the issue of being removed from BSA "[was] because of the Title IX complaint." During the phone conference, he repeatedly stated words to the effect, "I don't see the connection," "there is a lot going on here and I can't keep track of it all," and "I spoke to Jonathon [Locust] and he said that this behavior has to do with a fight about a student group."

144. Mr. Hughes also dismissed Ms. Doe's complaint that it was unfair and inconsistent with Title IX to expect *her* to move out of her residence when she was not the one instigating the retaliatory harassment. Mr. Hughes again invoked his belief that the harassment was not Title IX-related, and therefore the University could not put the onus on the other students to move.

145. Ms. Doe also raised the fact that the April assault had recently appeared in the Clery report when it had not earlier. It became clear that Mr. Hughes was unfamiliar with any details of the April assault (despite Title IX investigator Mr. McLaughlin's representation that the investigators would discuss with Mr. Hughes the interview transcripts and any follow-up required). She explained to Mr. Hughes what had unfolded in April 2016, including her report to Mr. Locust that had gone unreported.

146. The conversation left Ms. Doe concerned that Mr. Hughes did not fully grasp the full extent of her experience. Not wanting him to make determinations on her case without her detailed account, she offered to provide a written statement setting forth those details, and highlighting the retaliation and its connection to Title IX, before Mr. Hughes concluded his

investigation. She also asked to meet with Mr. Hughes before he made his decision, to provide details about the assaults she preferred to provide in person rather than in writing. Mr. Hughes agreed.

147.    Ms. Doe also reminded Mr. Hughes that the investigators had not contacted two important witnesses, Margaret and Rachel. She strongly encouraged him to contact Margaret about both the sexual-assault investigation and the retaliation.

**Failing to adequately investigate the assaults, the University ultimately finds no violation on Mr. Barrow's part. It also fails to investigate retaliation and Ms. Doe's complaint against Mr. Locust.**

148.    On December 29, 2016, Ms. Doe submitted to Mr. Hughes a detailed narrative of the assaults and the retaliation, and a document containing text messages with Ms. Doe's explanations. The text messages (from August 2016, before the second assault) confirmed that before reporting Mr. Barrow's September sexual assault to Mr. Locust, she had an amicable relationship with the other BSA members, but that after reporting    especially her formal complaint    the relationships swiftly deteriorated and they became hostile and aggressive toward Ms. Doe. The following group text, from around October or November 2016, reflects the hostility (Ms. Doe's name in the second message of the thread is redacted):



149.     Despite Ms. Doe's detailed written statement, and without waiting for her additional in-person statement, on January 3, 2017, Mr. Hughes issued a no-violation finding for both the April 2016 and September 2016 sexual assaults. The written notice of outcome determined that, using the preponderance-of-the-evidence standard, the "evidence available does not support the finding of a policy violation."

150.     The notice specifically stated that Mr. Barrow's version of the story    which Mr. Hughes apparently found equally or more compelling than Ms. Doe's detailed narrative    was that in both incidents, Ms. Doe "initiated the sexual encounter and requested the same," and that in the second incident, Ms. Doe "not only requested oral sex, but became angry and left the encounter

when the respondent wouldn't agree to further sexual activity." Mr. Hughes apparently believes that women beg men for the privilege of performing oral sex.

151.    The notice also claimed "this is not an incapacitation case," but in one of her interviews, Ms. Doe answered affirmatively to the question regarding the April assault, "were you to the point where you couldn't give consent?" And she stated that she fell when her friend Rachel took her to Mr. Barrow's room.

152.    Ms. Doe never had a hearing on her Title IX case (although all other disciplinary proceedings at Ashland, upon information and belief, offer hearings). She never saw Mr. Barrow's Title IX statement to be able to rebut it. She still does not know who the witnesses were who presented for Mr. Barrow, much less what they said    with one exception.

153.    The one exception was a statement by Taylor Banks, which Ms. Doe inadvertently saw because it had been mistakenly filed in the student-conduct file related to the Riley's incident. Ms. Doe reviewed that file on January 12, 2017, the day before her own student-conduct board hearing on the Riley's incident, and after Mr. Hughes had issued the notice of outcome. Ms. Banks's statement contained false statements about what happened the night of the April assault, and mentioned Ms. Doe's friend Rachel. Yet when Ms. Doe contacted Rachel to ask whether anyone called her to fact-check Ms. Banks's allegations, she learned that no one had.

154.    Besides Rachel, there were several others mentioned in Ms. Doe's investigative interview whom, upon information and belief (because Ms. Doe still has never seen a comprehensive interviewee list), neither the Title IX investigators nor Mr. Hughes contacted. Some are those who would have been able to speak to Ms. Doe's inebriated condition on the night of the April assault (and thus her incapacitation for purposes of being able to give consent to sexual activity). Rachel in particular would have been able to speak about the events leading up to and after the

April assault, including Ms. Doe's state of intoxication. She would also would have been able to speak to Ms. Goode-Harris's and Ms. Walker's physical violence against Ms. Doe at Riley's.

155.    One witness, Margaret, not only would have been able to corroborate the retaliation, but also   having been present when Mr. Barrow complained to his friends about the accusation of an assault in September 2016 and denied even entering her room   would have been able to speak to his credibility, his evolving story, and the plausibility of what he claimed happened. Although, in response to Ms. Doe's appeal, the University ultimately had Margaret write a statement, as discussed below, that process and review were inadequate, given the information Margaret would have provided had she been properly interviewed. This included information suggesting a pattern on Mr. Barrow's part: a year or so before the incident with Ms. Doe, Mr. Barrow had tried one evening to get Margaret herself to come back to his room with him. Despite her repeated refusals, he was so persistent that finally she had to lie about being on her period to make him stop. At that point, he called her a b*, and walked away to talk to another woman.

156.    The University failed to adequately investigate the sexual assaults. On balance, the University's approach to Ms. Doe's complaints about the sexual assaults and retaliation seemed like an intentional effort to insulate and protect a prominent athlete at her expense. In particular, the failure to interview (or timely interview) her witnesses suggests that that these officials were pursuing a predetermined outcome.

157.    As for retaliation, the notice of outcome mentioned nothing about this claim. In a follow-up email on January 3, 2017, Mr. Hughes stated that he was still having "difficulty drawing a direct connection between most of the communications and your Title IX case." But neither he nor the investigators ever investigated to determine what that connection could be by, for

example, interviewing Ms. Doe's witnesses. They only ever relied on Mr. Locust, who insisted that the retaliation was not Title IX-related.

158.    Had they interviewed Margaret, for example, they would have learned the following: that sometime after Thanksgiving but before January, she complained to Mr. Locust about retaliation that she herself was facing at the hands of Ms. Walker, Ms. Goode-Harris, Ms. Golden, Ms. Sanders, and Ms. Banks. As she explained, those students had demanded that Margaret choose a side between Mr. Barrow and Ms. Doe, and when Margaret refused to do so, they shut her out of their group, stopped talking to her, ignored her, stared her down in an intimidating way, and even tried to pick a physical fight with her. (The retaliatory treatment ultimately caused Margaret to transfer to The Ohio State University for the following academic year.)

159.    When Margaret explained the retaliation to Mr. Locust, he agreed that the students were wrong to treat her this way based on her position regarding Ms. Doe's reported sexual assault. That is, Mr. Locust agreed with Margaret that the girls were retaliating against her in violation of Title IX. The University's Title IX policy states: "The University will not tolerate retaliation in any form against any … student … who … serves as a witness, assists an alleger, or participates in an investigation of discrimination or harassment." **But Mr. Locust not only failed to report this blatant and acknowledged violation to Mr. Hughes as an independent Title IX violation, or to investigate it himself; he also failed to give Mr. Hughes this information as evidence supporting *Ms. Doe's* retaliation—even though Mr. Hughes and the investigators had completely entrusted Mr. Locust with the responsibility of investigating Ms. Doe's retaliation allegations.** If those students were retaliating against Margaret, a non-Complainant, based on her position on the sexual assault, that was compelling evidence that Ms. Doe's complaint was the basis for their ever-escalating

hostility toward Ms. Doe, as well. Ms. Doe never had the benefit of this additional evidence, however, because Mr. Locust never passed it along.

160.    Mr. Hughes's January 3 notice of outcome also mentioned nothing about Ms. Doe's complaint against Mr. Locust. Upon information and belief, the University never investigated that complaint.

### Mr. Barrow continues to violate the no-contact order with barely any repercussion and no Title IX punishment.

161.    Due to the lack of Title IX investigation into the retaliatory harassment by the five female students, Ms. Doe and Rose moved out of Kilhefner Hall in early January 2017. Ms. Doe moved most of her things out on January 7, planning to finish up and also help Rose move out on January 8, 2017.

162.    But she continued to have to battle the Title IX demons. On January 7, 2017, Mr. Barrow, contravening the no-contact order that was still in place, tweeted that he would be in Kilhefner Hall the next day to greet Ms. Walker for her birthday. (Upon information and belief, Mr. Barrow was not aware that Ms. Doe was moving.)

163.    Ms. Doe saw the tweet and immediately contacted Ms. Lammers, requesting help enforcing the no-contact order, as she still expected to be at Kilhefner that day, and "[i]t's very stressful to constantly feel unsafe since the no contact directive isn't being enforced and when an RA is repeatedly ignoring people being banned and letting them on her floor anyway."

164.    Ms. Lammers told Ms. Doe she would ensure the no-contact order was enforced, including by emailing the RAs and asking Mr. Locust to contact Mr. Barrow. On January 10, 2017, Mr. Hughes issued a new mutual no-contact directive to Mr. Barrow and Ms. Doe, prohibiting Mr. Barrow from entering Ms. Doe's new residence and Ms. Doe's workplace.

165.    But a mere two hours after delivery of this no-contact directive reminding Mr. Barrow of his existing ban from Ms. Doe's workplace, Mr. Barrow strolled into the suite looking for Mr. Locust. Ms. Doe immediately reported this violation to Mr. McLaughlin. The same day, now able to visit Kilhefner Hall, Mr. Barrow saw Alex, Ms. Doe's friend who had read Ms. Doe's Title IX question at the October 2016 Speak Up. Mr. Barrow stared Alex down, intimidating her.

166.    Despite Mr. Barrow's repeated violations of the no-contact order, the University barely disciplined Mr. Barrow for his transgressions. It failed to address any of the three no-contact violations through the Title IX process    and no one on the student-conduct board hearing his case was present in a Title IX capacity. And because Mr. Locust did not address each charge at the time when the violation occurred, subsequent charges did not add on to the sanction of the first.

167.    Up until two days before the hearing, Ms. Doe had no notice the hearing against Mr. Barrow was occurring    the hearing she believed was taking place was a student-conduct charge against Ms. Walker, not her rapist    and once there, contrary to policy, Ms. Doe and legal advocate Ms. Crary were not permitted to be present when Mr. Barrow presented.

168.    Mr. Barrow ultimately received from the student-conduct board only probated suspension    the same sanction that, as described below, Ms. Doe ultimately received for trying to protect herself when Ms. Walker and Ms. Goode-Harris physically assaulted her at Riley's on December 10, 2016. Contrary to the University's policy, Ms. Doe was also not informed of the outcome of Mr. Barrow's conduct hearing; she had to email to Mr. Locust for the information, leaving her too little time to appeal any determination.

**Still refusing to take the retaliation against Ms. Doe seriously, the University fails to investigate or hold a hearing for threatening tweets against Ms. Doe.**

169.    In the meantime, the threats against Ms. Doe became increasingly hostile and violent. On January 8, 2017, shortly after Ms. Lammers emailed the RA staff reminding them that Mr. Barrow was prohibited from entering Kilhefner, the peer retaliators tweeted the following:

   a.    Shamarr Golden: "Why people in college still tattle telling like they're 3yr."

   b.    Shamarr Golden: "I truly feel like if you falsely accuse someone of rape you deserve to go to jail."

   c.    Monae Goode-Harris: "There should be a law for people who lie about being raped to get sent to jail."

170.    These tweets followed on the heels of early-January tweets suggesting that Ms. Doe should be **"pistol whipped and shot at,"** that **"fat neck won't even have a neck when I'm done with b*"**:



171.    On January 5, 2017, Ms. Goode-Harris likewise tweeted a group photo in which Ms. Doe's image is visibly covered over. Ms. Golden wrote in response: "I see you had to do some editing lol." Ms. Goode-Harris tweeted back: "I laughed the entire time I was doing it."

172.    On January 9, 2017, Ms. Crary sent an email to Mr. Locust on Ms. Doe's behalf, again raising concerns that the University's response to the retaliation was deficient under Title IX, and trying to ensure the University addressed this despite the no-violation finding on the underlying sexual assaults.

173.    On January 11, 2017, Ms. Doe and Ms. Crary met with Mr. Hughes, Mr. Locust, and Mr. McLaughlin to urge a formal investigation and hearing related to the retaliation, which had been skirted over in the Title IX findings of early January.

174.    At the meeting, the officials seemed fixated on whether the women had blocked Ms. Doe from their Twitter accounts, under the theory that if Ms. Doe could not see the tweets, she would not be harmed by them. But the problem was not whether Ms. Doe could see the tweets (as long as she did not log in to her own account, she could still see the tweets), but that the women's posts expressed intent to harm her. Yet the University took no steps to remedy this ongoing campaign of retaliatory intimidation.

175.    Mr. Hughes also repeated his refrain that "when I get a complaint of sexual harassment by persons in [Mr. Locust]'s office, I contact Mr. Locust. He says that this has nothing to do with retaliation, so that is what I have to go by." As described above, Mr. Locust himself retaliated against Ms. Doe for her Title IX complaint. Thus, in concluding that the peer actions were not retaliatory, Mr. Hughes, the Title IX coordinator, was taking the word of a retaliator himself.

176.    Despite knowing of Ms. Doe's expressed concerns regarding Mr. Locust, Mr. Hughes then delegated the investigation into the retaliatory tweets to Mr. Locust.

177.    But Mr. Locust failed to act. As described below, he sat on the information for two months, until March 2017. Then, too, the issue resurfaced only when an intern in his office followed up on the complaint.

178.    Given the University's failure to protect Ms. Doe, in January 2017, Ms. Doe went back to the police to report the retaliatory tweets. It was only in late January or early February 2017 when the police contacted Ms. Goode-Harris and Ms. Walker and threatened them with criminal charges for intimidating a witness    that the women backed off.

**Instead of protecting Ms. Doe from retaliation, the University punishes Ms. Doe with unfounded disciplinary action for having tried to protect herself and for reporting the retaliators' physical assault.**

179.    On January 13, 2017, Ms. Doe attended the disciplinary hearing for the charge against her that she had violated the code of conduct when protecting herself from Ms. Goode-Harris's assault when Ms. Goode-Harris shoulder-checked Ms. Doe from behind (before Ms. Doe even knew who had shoved her).

180.    While Ms. Doe, through Ms. Crary, had actively worked to get the disciplinary hearing to be recognized as a Title IX-related proceeding (on the ground that Ms. Goode-Harris had assaulted her as part of the students' retaliation against her for reporting her sexual assault), Mr. Locust refused to agree to that. The student-conduct board had no one in a Title IX capacity. Also, Ms. Doe was not permitted to hear what Ms. Goode-Harris stated to the Board, and thus had no opportunity to rebut what Ms. Goode-Harris stated. Ms. Doe presented as best she could the events of the evening, explaining that she had reacted to being attacked from behind and had not initiated any contact, and explaining the retaliatory nature of Ms. Goode-Harris's assault in the context of the students' campaign of harassment against her in the previous months.

181.    Despite this presentation and despite the fact that in her written statement, Ms. Goode-Harris admitted her own fault and admitted that she was not injured, the student-conduct board found *Ms. Doe* in violation of three code provisions, including one for "physical abuse/self-endangerment."

182.    Ms. Doe was shocked not only by the outcome but also by the fact that she had been found in violation of three provisions, when only two charges had been included in the notice and read aloud during the hearing. Adding a third, which contravened the student-conduct code, was an additional retaliatory act against Ms. Doe. Upon information and belief, Mr. Locust, who sent the decision notice, had to sanction it.

183.    Ms. Doe was fined $150, given 15 hours of community service, and put on probated suspension until her graduation in May of 2017. As mentioned, probated suspension was the same penalty Mr. Barrow received for his three blatant violations of the Title IX no-contact order.

184.    This was Ms. Doe's first ever alleged conduct-code violation (and the first time she had ever gotten in trouble at any school). Yet **"probated suspension" is a last-chance penalty**. If Ms. Doe were to be found in violation of one more conduct-code provision, she would be suspended from campus, potentially putting her graduation in jeopardy.

185.    The fact that Ms. Doe was punished for staving off violent retaliation by Ms. Goode-Harris shows not only the University's failures under Title IX to adequately investigate the retaliation and to protect Ms. Doe from that retaliation, but also itself constitutes additional unlawful retaliation.

186.    Ms. Doe was devastated by the finding. She immediately became afraid to leave her room or use public spaces, as she believed that if anything happened to her again she would either be penalized for reporting or blamed for causing the event in the first place. She subsequently either walked with a companion or video-recorded all of her trips on campus to avoid any possibility of being suspended before she could graduate. Safe Haven and Ohio Alliance worked together to provide an escort for Ms. Doe each time she needed to walk to or from campus. The University declined to provide Ms. Doe with a safety escort.

187.    Reporting any further retaliatory threats through the Title IX process became out of the question.

**The University finally contacts Ms. Doe's witness Margaret but fails to conduct an interview and affirms the no-violation finding for Mr. Barrow.**

188.    On January 13, 2017, Ms. Doe appealed Mr. Hughes's decision on the sexual assault for procedural error and previously unavailable evidence, on the following grounds. First, Margaret had been offered as a witness and never contacted, and information she intended to provide directly contradicted Mr. Barrow's statement, as reflected in the notice of outcome, that he and Ms. Doe had engaged in consensual oral sex on September 11, 2016. Second, Ms. Doe had told Mr. Hughes that she herself had additional information she wished to share in an in-person meeting with Mr. Hughes before issuing his decision, but he issued his decision before meeting with Ms. Doe. Third, her friend Rachel had been named in Taylor Banks's statement and could refute the allegations made there but had never been interviewed.

189.    Although Ms. Doe had repeatedly mentioned during the Title IX investigation that Margaret had information about the sexual assault, Mr. Hughes stated that he was unable to "make the connection." Nonetheless, upon information and belief, he instructed the Title IX investigators to contact Margaret for a statement.

190.    Shortly thereafter, Margaret found a campus security officer    upon information and belief, Mr. McLaughlin    waiting for her outside of her afternoon class. Without providing any advance notice or opportunity to prepare, Mr. McLaughlin asked Margaret to follow him to an office in the same building to provide a statement describing what she knew about Ms. Doe's assaults. He asked a few introductory questions and then gave her a one-page form on which to write down her statement.

191.    Margaret's narrative described what Mr. Barrow at lunch one day told her and a couple of the five female students about what occurred the night of the September assault. He stated that

Page 40 of 58

"nothing happened"    that he had dropped Ms. Doe off at her room, never entered her room, and had to push her away from him.

192.    Upon information and belief, Margaret pointed out in her statement that later, Mr. Barrow changed his story to one of consensual oral sex.

193.    Margaret's narrative that Mr. Barrow denied even entering Ms. Doe's room differed from the statement in Mr. Hughes's report, which reflected that Mr. Barrow admitted to a "sexual encounter" but claimed he declined Ms. Doe's request for "further sexual activity."

194.    Upon information and belief, neither Mr. McLaughlin nor any other Title IX officer followed up to investigate the discrepancy Margaret identified. Mr. McLaughlin did not interview Margaret the way he had other witnesses. He did not give her any more than the one-page form on which to write. Nor did he ask her about any retaliation. After she wrote her statement, Mr. McLaughlin said, "It was an unfortunate situation. I just hope both [Ms. Doe] and [Mr. Barrow] can learn from it." The comment minimized the sexual assault, as if Ms. Doe were responsible for being assaulted.

195.    Thereafter, on January 24, 2017, the assigned appeal officer, Margaret Pomfret, reviewed the new evidence and affirmed Mr. Hughes's decision. But her findings fell short of an adequate review. They failed to acknowledge the inconsistency in Mr. Barrow's story that Margaret pointed out. They ignored the information beyond that in her written submission that Ms. Doe herself might have given if provided an opportunity to speak in person to Mr. Hughes before he issued a decision. They ignored any relevant information that interviewing Rachel might have provided on the credibility of Mr. Barrow and his witnesses.

**Traumatized and too afraid to leave her apartment, Ms. Doe seeks the president's help to ensure she graduates and can eat, and the president blames her for the assault. Meanwhile, Mr. Barrow retweets a threat implying Ms. Doe should be shot.**

196.     Too traumatized and afraid that she might again be wrongfully blamed for someone else's misconduct, and the accompanying possibility of leaving Ashland without a diploma, Ms. Doe left her room only minimally to get food off campus with friends or drive to student-teaching (she had no classes) or walk with an escort to her internship.

197.     On January 16, 2017, having exhausted all other avenues to obtain protection from the University, Ms. Doe emailed Dr. Campo, urging him to assist her in figuring out a safety system to ensure she could graduate. She explained that since the finding of probation a few days before, she had barely eaten, and asked for help to refund her meal plan or otherwise make it possible for her to eat without "implicating myself just by being in the campus dining facility."

198.     Despite the urgency and Ms. Doe's helplessness and fear, Dr. Campo failed to respond to Ms. Doe's letter for two days before sending an email through his secretary to set up a meeting for *15 days* later.

199.     Ms. Doe's advocates at the Ohio Alliance had to intervene to get any response in the interim. Outreach coordinator Kelly Becker was able to arrange a phone call with Mr. Hughes. But during the call, Mr. Hughes repeatedly minimized the risk and fear Ms. Doe felt, expressing that he did not understand why Ms. Doe felt unsafe, stating "she doesn't have to do this." He agreed to allow Ms. Doe to permit her friends to use her meal card to get food for her.

200.     Meanwhile, on January 30, 2017, before Ms. Doe had met with the president, Mr. Barrow retweeted the following post stating that "b* who lie about being raped Need at least a 15 pieces" (meaning 15 gun shots):



201.    While Ms. Doe reported Mr. Barrow's violent social-media post to the police, she saw no value in reporting through any Title IX avenue at the University. Again, the risk of additional retaliation without protection was too great. Ms. Doe was focused solely on getting through the remaining months until graduation.

202.    On February 3, 2017, Ms. Doe met with Dr. Campo, with Ms. Crary present as a support person. During this meeting, Ms. Doe explained what had occurred since their last meeting and how she was living in fear.

203.    Ms. Doe also showed him Mr. Barrow's retweet, to which Dr. Campo responded that it did not identify her by name and therefore did not constitute harassment.

204.    Ultimately, Dr. Campo accused Ms. Doe of being responsible for the assault, stating that she allowed herself to become vulnerable by drinking and "letting Daivon into your room." He ended the meeting 30 minutes before its scheduled conclusion time without providing Ms. Doe any relief.

**Through her appeal of the student-conduct determination, Ms. Doe once again raises the retaliatory nature of the Riley's incident, but the student-conduct board affirms the unfavorable finding.**

205.    On February 7, 2017, an appeal board heard Ms. Doe's appeal of the student-conduct determination against her for the December 11, 2016 incident at Riley's.

206.    In her appeal, Ms. Doe had raised a number of issues, including lack of notice of one of the charges, disproportionate punishment to the offense, lack of opportunity to rebut Ms. Goode-Harris's statements, and the impropriety of a false Title IX document being in the file, which she had viewed the day before her hearing and which caused her significant trauma.

207.    Most starkly, Ms. Doe added a number of documents showing the months-long harassment leading up to the incident at Riley's, including a group-text message in which Ms. Goode-Harris had written, referring to Ms. Doe: "Imma spit on her and when it run down her face it gone straight to her chest y'all know she don't got a neck." These documents showed Ms. Goode-Harris's motivation to hurt Ms. Doe, and that Ms. Doe had reported the retaliatory harassment to the University. Thus, through her student-conduct appeal, Ms. Doe once again put the University on notice of the Title IX retaliation she was facing.

208.    Despite these efforts, the student-conduct board affirmed the decision, although it reduced her sanction to a $100 fine and 10 hours of community service. Upon information and

belief, Mr. Locust, as student-conduct director, had the final decision over the student-conduct board's recommendation and thus sanctioned this punishment against Ms. Doe.

209.    Ms. Goode-Harris also apparently appealed whatever finding had been made against her. (And despite Ms. Doe's protest, the same hearing panel who heard Ms. Doe's appeal first heard Ms. Goode-Harris's appeal.) Shortly after receiving the appeal results, Ms. Goode-Harris tweeted, "So grateful for Jonathon man if it wasn't for him I would've been down."

210.    Ms. Doe was shocked by this tweet. Ms. Goode-Harris's tweet implies that Mr. Locust, who should have been an unbiased party, inappropriately helped Ms. Goode-Harris in some way, while sanctioning punishment against Ms. Doe that he knew was unfounded because she was protecting herself from retaliatory harassment.

211.    In addition, although Ms. Doe and her friend Rachel both brought charges against Ms. Walker in addition to Ms. Goode-Harris — and Mr. Locust had earlier assured Ms. Doe that the conduct-board hearing would be against both women — upon information and belief, Ms. Walker faced no conduct-board hearing for the charges against her. Upon information and belief, Mr. Locust has authority over whether and what charges are brought to the student-conduct board.

212.    Mr. Locust did what he could to protect Ms. Doe's retaliators while sanctioning the penalty against, and thus retaliating against, Ms. Doe.

### Mr. Locust and Mr. Hughes admit that Mr. Barrow's friends had retaliated against Ms. Doe, but they fail to take action against the women, violating University policy.

213.    On March 13, 2017, an intern within the student-conduct office was reviewing the file and emailed Ms. Doe asking if she would like to pursue "harassment" charges against Ms. Walker, Ms. Goode-Harris, and Ms. Golden. This was the first Ms. Doe had heard about any potential action since the January 11, 2017 meeting at which Mr. Hughes had delegated to Mr. Locust the task of following up on the retaliatory social-media posts.

214.    A few days later, the intern revised his earlier email and stated that the charge would be for "inappropriate behavior" (which carries a lower penalty). Upon information and belief, Mr. Locust instructed this change   showing again an effort to minimize the peer harassment and its connection to Ms. Doe's reporting under Title IX.

215.    Ms. Doe followed up with both Mr. Locust and Mr. Hughes, pointing out the blatant connection between her Title IX report and the threats of physical violence, most recently in Mr. Barrow's January 30, 2017 tweet saying that "b* who lie about being raped need at least a 15 pieces" (meaning being shot 15 times)   which, as she pointed out to them, she had refrained from reporting through University channels due to her past experience that doing so only meant she would face further retaliation.

216.    In her email, she laid out the provisions in the student handbook relating to "harassment," "sexual harassment," and "inappropriate behavior," pointing out that any bullying, intimidation, or harassing on the female students' part related to her rape and report of the rape would be properly characterized at least as "harassment," not simply "inappropriate behavior." (Specifically at issue were the students' tweets from January 8, 2017 stating that anyone who lies about rape should go to jail, as well as earlier threatening messages and retaliatory acts of which Ms. Doe had complained. The January 8 tweets had immediately followed Ms. Doe's reports that Mr. Barrow had violated the no-contact order   which, of course, had been put in place *because of the Title IX case*.)

217.    Per usual, Mr. Hughes abdicated his Title IX responsibilities, punting to Mr. Locust to classify the charges, at the same time backing up Mr. Locust in Mr. Locust's decision to classify the students' misconduct as simply "inappropriate behavior."

218.    Mr. Locust, for his part, continued to deny that the female students' tweets fell under the Title IX policy or the Code of Conduct's references to "harassment" or "sexual harassment."

Mr. Locust maintained that somehow none of the tweets constituted harassment because they were not "directly directed toward you, said to you or included your name." He further stated as if it were relevant that even the text messages submitted earlier were in a private group chat to which the public was not privy.

219.    On or around April 6, 2017, Ms. Doe and her support person Ms. Painter met with Mr. Locust and Mr. Hughes, to show them, for the umpteenth time, how the female students' conduct easily fell within "harassment" under the Code of Conduct and "retaliation" under the University's Title IX policy, because those students retaliated against Ms. Doe *because of* her Title IX report. Ms. Painter literally read to the University officials the definition of "retaliation" from the University's own policy.

220.    At every turn, Ms. Doe and Ms. Painter struggled against the male University officials' refusal to acknowledge the obvious. In response to Mr. Locust's contention that the posts were not harassment because they did not name Ms. Doe, Ms. Doe reminded Mr. Locust of Ms. Walker's Snapchat post from fall 2016, which stated, "[M]y name is [Ms. Doe] and I like lying on people."

221.    Mr. Locust also was adamant that Ms. Doe had never asked for a conduct board on the Snapchat, ignoring that she had reported this to Safety Services and that she had shown it to him and others on multiple occasions in conjunction with other pieces of evidence in her plea for help. (Later in the meeting, however, Mr. Locust suddenly had a change of heart and apologized for not addressing the problem in an appropriate time frame. He stated that he understood the conduct was harassment and admitted that he should have held a conduct-board hearing sooner.)

222.    At the same time, Mr. Hughes and Mr. Locust both maintained, disingenuously, that the University had not waited on the conduct-board process to address Ms. Doe's concerns of

potential Title IX retaliation but addressed those concerns "as closely as possible in time with when they were reported." But by this meeting it was nearly three months since Ms. Doe had asked for disciplinary action regarding the early-January threatening tweets.

223.    Mr. Hughes and Mr. Locust claimed that they had spoken to the female students and the retaliatory conduct had stopped. Ms. Doe emphasized that the behavior only stopped because she had not left her on-campus apartment due to safety concerns, leaving the female students with no further opportunity to physically threaten or assault her. (The police had also warned the students.)

224.    Finally, Mr. Hughes, looking at the University's Title IX policy, admitted that the students' tweets indeed fell within the definition of "retaliation." But instead of agreeing to a conduct-board hearing, in a display of indifference to Ms. Doe's experience, Mr. Hughes suggested having a meeting between the women and Ms. Doe. As Ms. Painter stated at the meeting, this matter was beyond any kind of mediation. Ms. Doe pointed out in a follow-up email: "These girls have called me a liar, physically assaulted me, said I should be in jail, made false reports to help the man that caused all of this, and have told many people on this campus what they 'believe' happened that night." The suggestion seemed to Ms. Doe to be just one more excuse for not holding her peers responsible for their retaliation as the Title IX policy and the law required.

225.    If Ms. Doe had held out any hope that the intern's March email would be an opening to some action on the University's part, the April meeting with Mr. Hughes and Mr. Locust dashed that hope. Ultimately, even when Mr. Hughes admitted the students' conduct constituted retaliation and Mr. Locust suggested a student-conduct board hearing, Mr. Hughes stated there was no point in doing so because the women's behavior had stopped and it was nearly the end of the semester    never mind that Ms. Doe had been asking them to assist her in ending the

harassment since the latter part of the first semester. In a subsequent email, Mr. Locust confirmed that the University would not pursue a conduct-board hearing although he denied that it had anything to do with timing. He claimed, instead, that it was not "appropriate" to pursue a student-conduct hearing because "the University put a halt to the concerning behavior."

226.    These male University officials ignored her, but Ms. Doe's email put it best: "If you do not pursue this conduct board you are setting a precedent that this university is a free-for-all and that students get to avoid consequences for their actions when faculty delay or mismanage cases. / … [T]here must be a student conduct board for harassment, or the campus will be in violation of its own policies and the federal law."

227.    No student conduct board ever took place. Nor did the officials ever investigate the tweet on Mr. Barrow's page calling for "[b]itches who lie about being raped Need at least a 15 pieces."

228.    The University failed Ms. Doe and other students in its officials' complete failure to recognize, acknowledge, and address the peer retaliation that Ms. Doe repeatedly put in front of their faces.

### Ms. Doe suffers from severe depression, including suicidal ideation, stemming from the University's betrayal and failure to protect her.

229.    In summer 2017, Ms. Doe saw Mr. Locust in downtown Cleveland. Seeing him triggered feelings of deep depression, as though everyone else was living a normal life as if nothing had happened, and she was not. On July 29, 2017, she wrote a suicide note, listing the events that had occurred at Ashland, and specifically naming Mr. Locust, Dr. Clayborne, Mr. McLaughlin, Mr. Hughes, and Dr. Campo: "I hope you never have a daughter and if you do that she never goes through what you put me through." Then, around the one-year anniversary of the second

assault, in September 2017, Ms. Doe had a breakdown and was involuntarily admitted to Mercy Hospital for five days. She was diagnosed with major depression.

230.    Ms. Doe has continued to experience stress and trauma, including consistent nightmares, as a result of the assaults and retaliation, exacerbated by the University's failure to adequately respond.

## CLAIM 1
### SEX DISCRIMINATION AGAINST ASHLAND UNIVERSITY UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. §§ 1681–88

231.    Plaintiff incorporates all previous allegations.

232.    Title IX prohibits sex discrimination by recipients of federal education funding.

233.    Ashland University agreed to comply with all applicable federal statutes relating to nondiscrimination by recipients of federal financial assistance.

234.    Ashland University had notice when it accepted federal funding under Title IX that the institution would be liable for intentional sex discrimination and deliberate indifference to sexual harassment.

235.    A private right of action to enforce Title IX's guarantees encompasses deliberate indifference to sexual harassment of a student by another student.

236.    Sexual assault is the most vicious form of sexual harassment.

237.    Mr. Barrow's forcing Ms. Doe to perform oral sex constituted sex-based harassment and sexual misconduct.

238.    Ms. Doe's April 2016 report to Jonathan Locust, Director of Student Conduct and Diversity and a deputy Title IX coordinator, gave Ashland University actual notice of Mr. Barrow's sexual assault, which was gender based.

239.    Mr. Locust was an appropriate official of Ashland University for purposes of reporting Ms. Doe's Title IX allegations.

240.     Mr. Locust (again, the Director of Student Conduct and Diversity, and a deputy Title IX coordinator) was in a position to vindicate Ms. Doe's rights.

241.     Mr. Locust had authority to address the discrimination.

242.     Mr. Locust had authority to institute corrective measures.

243.     Mr. Locust had a non-discretionary duty to notify one of the Title IX coordinators, Hannah Clayborne or Joshua Hughes, as soon as possible about what Ms. Doe had told him regarding the April 2016 assault. But Mr. Locust failed to perform that non-discretionary duty.

244.     Ms. Doe expected Mr. Locust to act in accordance with written University policy.

245.     It was reasonable for Ms. Doe to expect that her mentor and supervisor, who was also the Director of Student Conduct and Diversity, and a deputy Title IX coordinator, would act in accordance with written University policy.

246.     Ms. Doe expected Mr. Locust to act in accordance with the law.

247.     It was reasonable for Ms. Doe to expect that her mentor and supervisor, who was also the Director of Student Conduct and Diversity, and a deputy Title IX coordinator, would act in accordance with the law.

248.     Mr. Locust was deliberately indifferent to the sex-based harassment that Ms. Doe reported.

249.     Mr. Locust acted with gender-based discriminatory intent in responding to Ms. Doe's report of the April 2016 assault with comments such as that alcohol is a "truth serum," and by failing to report that report up to the Title IX coordinator.

250.     Mr. Locust's response to Ms. Doe's report of the April 2016 assault    to do nothing but tell her that, if she was drinking, she must have wanted the sexual activity with Mr. Barrow    was clearly unreasonable in light of the known circumstances.

251.     Mr. Locust's failure to act violated University policy and federal law.

252.    Mr. Locust's failure to act regarding Ms. Doe's April 2016 assault tacitly endorsed Mr. Barrow's sexual assault of Ms. Doe, made all female students more vulnerable to sexual assault, and led to Mr. Barrow's subsequent assault of Ms. Doe in September 2016.

253.    Ms. Doe's second Title IX complaint — her report regarding the September 11, 2016 assault to Mr. Locust and then to Mr. Hughes about the first and second assaults — and her complaint to Mr. Hughes about Mr. Locust's failure to report the first assault gave Ashland University actual notice of the discrimination.

254.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo were in a position to vindicate Ms. Doe's rights regarding the September assault.

255.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo had authority to address the discrimination.

256.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo had authority to institute corrective measures.

257.    Ms. Doe expected Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo to act in accordance with written University policy.

258.    It was reasonable for Ms. Doe to expect that Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo would act in accordance with written University policy.

259.    Ms. Doe expected Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo to act in accordance with the law.

260.    It was reasonable for Ms. Doe to expect that Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo would act in accordance with the law.

261.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo were deliberately indifferent to the sex-based harassment that Ms. Doe reported.

262.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo's failure to adequately respond to Ms. Doe's reports violated University policy and federal law.

263.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo's failure to adequately respond to Ms. Doe's reports tacitly endorsed Mr. Barrow's sexual assault of Ms. Doe and made all female students more vulnerable to sexual assault.

264.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo acted with gender-based discriminatory intent in failing to take remedial steps to protect Ms. Doe and address her Title IX complaint.

265.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo's failure to take remedial steps to protect Ms. Doe and address her Title IX complaint violated University policy and federal law.

266.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo's failure to take remedial steps to protect Ms. Doe and address her Title IX complaint tacitly endorsed Mr. Barrow's sexual assault of Ms. Doe and made all female students more vulnerable to sexual assault.

267.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo were deliberately indifferent to the sex-based harassment that Ms. Doe reported.

268.    Ashland University was deliberately indifferent to the sex-based harassment that Ms. Doe reported.

269.    Ashland University's unwritten custom, policy, or practice of failing to enforce or effectively implement its written policies regarding responding to reports of sexual misconduct made Ms. Doe more vulnerable to subsequent sexual assault by the same perpetrator.

270.    Ms. Doe suffered as a direct and proximate result of Ashland University's failure to effectively implement its own written policies regarding responding to sexual-misconduct allegations.

271.    Ashland University acted with gender-based discriminatory intent in failing to respond to Ms. Doe's complaint. Ashland University's ineffectual implementation of its written policies made Ms. Doe more vulnerable to a second sexual assault and retaliation for reporting that assault.

272.    Ashland University's failure to take appropriate action in response to Ms. Doe's report violated University policy and federal law.

273.    Ashland University's failure to act tacitly endorsed Mr. Barrow's sexual assault of Ms. Doe and made all female students more vulnerable to sexual assault.

274.    Ashland University failed to follow its own written sexual-violence policy in response to Ms. Doe's Title IX report that she was sexually assaulted.

275.    Ashland University failed to follow its own written sexual-violence policy in response to Ms. Doe's Title IX report that Mr. Locust had violated the University's written policy.

276.    Mr. Locust, Mr. Hughes, Dr. Clayborne, Mr. McLaughlin, and Dr. Campo's actions unreasonably interfered with Ms. Doe's participation in the educational programs at the University and with her physical and emotional wellbeing.

277.    As a direct and proximate result of these unlawful and malicious acts, Ms. Doe has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

## CLAIM 2
### RETALIATION AGAINST ASHLAND UNIVERSITY UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. §§ 1681−88

278.    Plaintiff incorporates all previous allegations.

279.    Title IX prohibits retaliation in response to reporting discrimination under Title IX.

280.    Ashland University agreed to comply with all applicable federal statutes relating to retaliation under Title IX.

281.    Ashland University had notice when it accepted federal funding under Title IX that the institution would be liable for deliberate indifference to retaliation against students for reporting sexual abuse or advocating for Title IX complainants.

282.    A private right of action to enforce Title IX's guarantees encompasses retaliation for advocating for the Title IX rights of oneself and others.

283.    The physical and verbal threats and hostility Ms. Doe and her friends faced from Mr. Barrow and the five female students in response to Ms. Doe's reporting the second assault constituted sex-based harassment and retaliation.

284.    Ashland University was deliberately indifferent to the retaliation that Ms. Doe reported.

285.    Ashland University failed to follow its own sexual-harassment policies in response to Ms. Doe's complaint that other students were retaliating against her and her friends.

286.    Ashland University failed to take appropriate action to prevent further retaliation against Ms. Doe after she reported the retaliation to several administrators including Mr. Locust, Mr. Hughes, Ms. Lammers, the Title IX investigators, and Dr. Campo, and after Ms. Doe's friend Margaret reported the retaliation to Mr. Locust.

287.    Mr. Locust retaliated against Ms. Doe because she reported sex discrimination. This retaliation included: authorizing student-conduct charges against and sanctioning punishment against Ms. Doe for protecting herself from retaliation and for reporting retaliation; failing to treat Ms. Doe equitably and impartially vis-à-vis her peer retaliators; failing to take timely and corrective interim measures to protect Ms. Doe from Mr. Barrow's no-contact violations; failing to acknowledge and covering up the retaliation Ms. Doe was facing at the hands of her peer

retaliators; failing to provide the Title IX coordinator with information about retaliation against Ms. Doe's friend Margaret, which was evidence of retaliation against Ms. Doe, as well.

288.    Mr. Locust's conduct would dissuade a person of ordinary fitness from engaging in protected activity.

289.    Ashland University, through Mr. Locust's actions, retaliated against Ms. Doe.

290.    As a result of Ashland University's deliberate indifference, Daivon Barrow and five female students were openly hostile to Ms. Doe and her friends following her report of the second sexual assault.

291.    The students' hostility was in retaliation for Ms. Doe's Title IX complaint about Mr. Barrow.

292.    The five students were aware that Ms. Doe filed a complaint about Mr. Barrow when they proceeded to remove her from her position as President of the Black Students Alliance and Diversity on Campus.

293.    The five students and Mr. Barrow were aware of Ms. Doe's Title IX complaint when they texted, tweeted about, and physically assaulted Ms. Doe or her friends.

294.    Ashland University's unwritten custom, policy, or practice of failing to enforce or effectively implement its written policies regarding responding to reports of sexual misconduct made Ms. Doe more vulnerable to the retaliation that she faced as a result of reporting that second sexual assault.

295.    As a direct and proximate result of these unlawful and malicious acts, Ms. Doe has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A.  Declare that Defendant's acts and conduct constitute violations of federal law;

B.  Enter judgment in Plaintiff's favor on all claims for relief;

C.  Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that Plaintiff has suffered and is reasonably certain to suffer in the future;

D.  Award pre-judgment and post-judgment interest at the highest lawful rate;

E.  Award Plaintiff reasonable attorneys' fees (including expert fees) and all other costs of this suit;

F.  Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable just, or proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/ Sandhya Gupta*
Ashlie Case Sletvold (0079477)
Donald P. Screen (0044070)
Sandhya Gupta (0086052)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Ashlie.Sletvold@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Sandhya.Gupta@ChandraLaw.com

*Attorneys for Plaintiff Jane Doe*

## CERTIFICATE OF SERVICE

I certify that on September 12, 2018, this document was filed using the Court's ECF system, which will send notification to all counsel of record.

_/s/ Sandhya Gupta_
_One of the attorneys for Plaintiff Jane Doe_